No. 16-2365

In The

# United States Court of Appeals for the Third Circuit

**Federal Trade Commission**
and **Commonwealth of Pennsylvania**

*Appellants,*

v.

**Penn State Hershey Medical Center**
and **PinnacleHealth System,**

*Appellees.*

Appeal From The United States District Court
For The Middle District Of Pennsylvania
No. 1:15-cv-02362 (Hon. John E. Jones III)

## Brief of Appellees Penn State Hershey Medical Center and PinnacleHealth System

James P. DeAngelo
Kimberly A. Selemba
MCNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
(717) 237-5470

Toby G. Singer
Adrian Wager-Zito
Julie E. McEvoy
Louis K. Fisher
Christopher N. Thatch
William D. Coglianese
Alisha M. Crovetto
Jon G. Heintz
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3939

# CORPORATE DISCLOSURE STATEMENT

The parent corporation of Appellee Penn State Hershey Medical Center is Pennsylvania State University.  Appellee PinnacleHealth System has no parent corporation.  No publicly held corporation owns 10% or more of the stock in either Penn State Hershey Medical Center or PinnacleHealth System.  No publicly held corporation which is not a party to this appeal has a financial interest in the outcome of this proceeding.

Dated:  June 13, 2016                    */s/* Louis K. Fisher
                                          _____

                                          *Counsel for Appellees Penn State Hershey Medical*
                                          *Center and PinnacleHealth System*

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ................................................................. i

Introduction ............................................................................................... 1

Questions Presented ................................................................................... 3

Statement Of The Case .............................................................................. 3

    A. Hershey And Pinnacle Develop Plans To Combine. ......................... 3

    B. After A Five-Day Evidentiary Hearing, The District Court Denies
       The Government's Motion To Preliminarily Enjoin The
       Combination. .................................................................................... 7

Summary Of Argument ............................................................................ 12

Standard Of Review ................................................................................. 15

Argument .................................................................................................. 16

    I. The District Court Did Not Clearly Err In Finding That The
      Government Failed To Establish A Valid Geographic Market. ......... 16

      A. The Government Failed To Show That The Harrisburg Area Is A
         Relevant Geographic Market. ....................................................... 18

         1. The Hypothetical-Monopolist Test Requires Assessment Of
            Whether A SSNIP Would Be Profitable. .................................. 18

         2. The Government Failed To Show That Bargaining Would Result
             In A SSNIP. ............................................................................... 20

         3. The Government Failed To Show That A SSNIP Would Not
             Result In Patients Turning To Realistic Alternatives. ............... 28

      B. The Government's Attacks On The District Court's Market Analysis
         All Fail. ......................................................................................... 30

         1. The Court Did Not Ignore Payors. ............................................ 31

         2. The Government's Argument Regarding A Pinnacle-Only SSNIP
             Lacks Merit. ............................................................................... 35

         3. The Court Did Not Base Its Market Analysis On The Hospitals'
             Rate Agreements With The Area's Two Largest Payors. ........... 36

    II. The District Court Did Not Clearly Err In Holding That The
      Combination's Many Procompetitive Effects Weigh In Favor Of
      Denying Injunctive Relief. ............................................................... 38

      A. The Court Correctly Concluded That The Rate Agreements Support
         The Combination. .......................................................................... 39

B.  The Court Correctly Found That The Combination Will Generate Procompetitive Benefits By Enabling The Hospitals To Address Hershey's Capacity Constraints Immediately And Efficiently.........................41

C.  The Court Correctly Found That Repositioning By Other Area Health Systems Will Foster Robust Competition After The Hospitals Combine. .............................................................................................43

D.  The Court Correctly Found That The Combination Will Improve The Hospitals' Ability To Engage In Risk-Based Contracting.......................46

E.  The Court Correctly Determined That Any Potential Harm Is Outweighed By The Public Benefits Of Allowing The Combination To Proceed.......................................................................................................48

Conclusion...................................................................................................................50

Certificate Of Compliance

Certificate Of Service

# <u>TABLE OF AUTHORITIES</u>

Page

**CASES**

*Borough of Lansdale v. Phila. Elec. Co.,*
   692 F.2d 307 (3d Cir. 1982) ............................................................... 30

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962) ........................................................................... 44

*California v. Sutter Health Sys.,*
   130 F. Supp. 2d 1109 (N.D. Cal. 2001) ......................................... 19, 32

*F.T.C. v. Butterworth Health Corp.,*
   946 F. Supp. 1285 (W.D. Mich. 1996) ........................................... 39, 43

*F.T.C. v. Freeman Hosp.,*
   69 F.3d 260 (8th Cir. 1995) ......................................................32, 33, 38

*F.T.C. v. H.J. Heinz Co.,*
   246 F.3d 708 (D.C. Cir. 2001) ............................................ 16, 38, 48, 49

*F.T.C. v. Lane Labs-USA, Inc.,*
   624 F.3d 575 (3d Cir. 2010) ............................................................ 15, 31

*F.T.C. v. Lundbeck, Inc.,*
   650 F.3d 1236 (8th Cir. 2011) .............................................................. 31

*F.T.C. v. ProMedica Health Sys.,*
   No. 3:11-cv-47, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ............... 43

*F.T.C. v. Tenet Health Care Corp.,*
   186 F.3d 1045 (8th Cir. 1999) ........................................................*passim*

*F.T.C. v. Univ. Health, Inc.,*
   938 F.2d 1206 (11th Cir. 1991) ............................................................ 16

*Giles v. Kearney,*
   571 F.3d 318 (3d Cir. 2009) ................................................................. 47

*Gordon v. Lewistown Hosp.,*
   272 F. Supp. 2d 393 (M.D. Pa. 2003) .................................................. 32

*Gordon v. Lewistown Hosp.,*
   423 F.3d 184 (3d Cir. 2005) ........................................................*passim*

*Houser v. Fox Theatres Mgmt. Corp.,*
   845 F.2d 1225 (3d Cir. 1988) .............................................................. 25

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999) ................................................................42

*In re Se. Milk Antitrust Litig.*,
    739 F.3d 262 (6th Cir. 2014) ..............................................................18

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013)..................................................................15

*Little Rock Cardiology Clinic PA v. Baptist Health*,
    591 F.3d 591 (8th Cir. 2009) ..............................................................26

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*,
    511 F.3d 350 (3d Cir. 2007) ...............................................................15

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*,
    315 F.3d 1335 (Fed. Cir. 2003) ................................................... 34, 44

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*,
    778 F.3d 775 (9th Cir. 2015) ..............................................................29

*Scully v. US WATS, Inc.*,
    238 F.3d 497 (3d Cir. 2001) ...............................................................42

*St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*,
    No. 1:12-cv-00560, 2015 WL 9957541 (D. Idaho Dec. 10, 2015)............................49

*United States v. Long Island Jewish Med. Ctr.*,
    983 F. Supp. 121 (E.D.N.Y. 1997)......................................................39

*United States v. Mercy Health Servs.*,
    902 F. Supp. 968 (N.D. Iowa 1995).....................................................19

*Weiss v. York Hosp.*,
    745 F.2d 786 (3d Cir. 1984) ...............................................................31

## STATUTES

15 U.S.C. § 18.........................................................................................7

15 U.S.C. § 53.........................................................................................7

## OTHER AUTHORITIES

D.O.J. and F.T.C., *Horizontal Merger Guidelines* (2010)...................................*passim*

Statement of the FTC In the Matter of Phoebe Putney Health System,
    Inc., et al. (Mar. 31, 2015), https://goo.gl/oLxUg6 ....................................48

# INTRODUCTION

The question raised in this fact-bound appeal is straightforward: did the district court clearly err in finding that the Federal Trade Commission and the Commonwealth of Pennsylvania ("the Government") failed to establish the factual predicates needed to preliminarily enjoin the combination of Penn State Hershey Medical Center and PinnacleHealth System ("the Hospitals")? The answer is just as simple: the court was entirely correct, and certainly did not clearly err.

The court found that the Government failed to establish an essential element of its case: a valid geographic market in which to analyze the combination. As the court explained, the Government's alleged four-county market is "unrealistically narrow" and does not reflect "the commercial realities faced by consumers in the region." App.14. The court also held that even if the Government *had* established a valid market, the evidence shows that "anticompetitive effects would not arise through the merger" (App.15-16), and that the Hospitals' combination will benefit consumers in significant ways, including by: driving costs down, relieving long-standing capacity constraints at Hershey that harm patient care, and strengthening the Hospitals' ability to adapt in an evolving and increasingly competitive healthcare landscape.

As the court's opinion makes clear, these findings were thoroughly grounded in the court's up-close assessment of the evidence, developed over the course of a five-day evidentiary hearing in which the court heard live testimony from fifteen witnesses and admitted thousands of exhibits. That evidence overwhelmingly supports the court's findings. More to the point, the Government cannot establish that the court clearly erred on either issue. That suffices to doom the Government's appeal.

Trying to transform this appeal into a high-level debate over the framework for analyzing mergers (and to escape deferential clear-error review), the Government

purports to identify various legal errors in the district court's market analysis. But this Court has repeatedly recognized that market analysis is a factual issue, and all of the Government's objections arise from quintessential fact-based disputes. In any event, these arguments rest on distortions of both the record evidence and the district court's opinion.

Indeed, the Government's entire brief relies on a rendition of the evidence that bears little resemblance to the actual record. Most significantly (and most frequently), it distorts the deposition testimony of commercial payors, repeatedly claiming that those entities said they would have no choice but to give in to a price increase. In fact, those payors said no such thing, and no commercial payor even opposes the combination (other than one that is affiliated with a competitor of both Hospitals and that represents just 1% of the market). The Government couples its skewed depiction of the evidence with repeated assaults on the integrity of the district court's opinion. In the Government's view, the court "ignored" any evidence or argument it did not explicitly address (Br.26, 34, 35, 36, 37, 38, 55, 56); evidence was "unrebutted" so long as the Government does not mention the rebutting evidence (Br.35, 38, 39, 41, 42, 56); and the court's resolution of disputed issues in the Hospitals' favor was "uncritical[]," "speculat[ive]," or "lack[ing] any analytical rigor" (Br.29, 39, 49, 51, 52, 53).

These unseemly attacks on the district court cannot bridge the evidentiary gaps in the Government's case. The court reached the correct result, and the Government has not provided any basis for setting that decision aside.

## QUESTIONS PRESENTED

**I.**    Did the district court clearly err in concluding that the Government could not show a likelihood of success because its alleged geographic market is "unrealistically narrow"?

**II.**    Did the district court clearly err in finding that the combination will produce substantial consumer benefits and that the public interest therefore supports allowing the combination to proceed?

## STATEMENT OF THE CASE

### A.    *Hershey And Pinnacle Develop Plans To Combine.*

**1.**    Pinnacle is a not-for-profit health system with three hospital campuses: Harrisburg Hospital and Community General Osteopathic Hospital in Dauphin County, and West Shore Hospital in Cumberland County.  App.585:12-20.[1]  Pinnacle focuses on cost-effective primary- and secondary-care services, and offers only a limited range of high-level services.  App.570:10-572:15.  It employs fewer than 300 physicians, and relies on an open medical staff of independent physicians with admitting privileges at its campuses.  App.788 ¶87; App.631:24-632:11.  Consistent with Pinnacle's emphasis on lower-acuity care, its physicians are not highly specialized; only 35% are fellowship-trained (in 32 specialties).  App.788 ¶87.

Pinnacle is a community hospital, and draws most of its patients from in and around Harrisburg.  App.784 ¶45.  Its primary service area (where 75% of patients reside) spans four counties; its secondary service area (90%) spans nine.  App.781-82.  Pinnacle's main competitors are other community hospitals near Harrisburg:  Holy

---

[1] Given this appeal's expedited schedule, the parties did not have time to agree on appendix contents before the Government filed its brief.  The Hospitals are thus filing supplemental appendix materials.

Spirit and Carlisle Regional (Cumberland County); WellSpan York (York); WellSpan Good Samaritan (Lebanon); and Lancaster General, Lancaster Regional, and Heart of Lancaster Regional (Lancaster). App.586:1-25. Although Pinnacle competes with Hershey on certain services they both offer, the limited extent of that overlap confines this competition. App.607:24-608:1, 569:8-572:15, 628:15-632:11.

    **2.**    Hershey is an academic medical center ("AMC") and the Penn State College of Medicine's primary teaching hospital. App.565:16-567:13. As an AMC, Hershey offers all levels of care but specializes in high-acuity tertiary or quaternary services unavailable at most hospitals. App.570:10-572:15. Among other things, Hershey operates central Pennsylvania's only specialty children's hospital, one of Pennsylvania's three Level I trauma centers serving adults and children, and the Commonwealth's only heart-transplant center outside Philadelphia and Pittsburgh. App.566:2-6, 571:22-572:5; App.742. Given its higher-level offerings, Hershey treats patients who are generally sicker than those at community hospitals like Pinnacle: Hershey has Pennsylvania's 14th-highest average acuity-per-discharge; Pinnacle ranks 43rd. App.786 ¶72.

    To deliver its high-complexity care, Hershey employs more than 800 physicians who see patients and also serve as faculty and clinical researchers. App.565:23-566:1, 569:14-20. These physicians are highly specialized; 64% are fellowship-trained, in roughly 80 specialties. App.788 ¶86. Hershey also bears the costs of conducting research and clinical trials, and of teaching roughly 1700 medical students, nurses, physician-assistants, residents, and fellows annually. App.568:12-569:7. Accordingly, its cost of inpatient care is 64% higher than Pinnacle's: $3,663 per patient-day, compared to $2,238. App.790 ¶91.

Because of its advanced capabilities, Hershey draws patients from a broader area than Pinnacle and other community hospitals: its primary service area spans 13 counties; its secondary service area spans 21. App.627:1-8. Hershey competes with other AMCs in nearby cities—particularly the Hospital of the University of Pennsylvania and Thomas Jefferson University Hospital in Philadelphia, Johns Hopkins Hospital in Baltimore, and the University of Pittsburgh Medical Center ("UPMC"). App.573:7-20; App.725-26.

As a result of Hershey's specialization and reputation, it faces significant demand for its services. The problem is that Hershey has long lacked sufficient space to care for all those patients. App.578:16-579:11. Although the optimal midnight occupancy rate for hospitals is 80-85% (App.659:10-15), Hershey's average over the past several years has been 89%, and it has exceeded 98% peak occupancy two out of every three days. App.648:10-652:19; App.732. Hershey's capacity constraints negatively affect patients: wait times are too long (App.653:4-8); patients are often assigned to units designed for other services or "boarded" on hallway beds (App.640:9-645:10); and transfers and referrals frequently must be denied (App.610:20-22, 653:9-20).

Hershey has battled for years to relieve its capacity constraints. Among other things, it opened a new children's hospital in 2013 that created additional capacity for adults, moved rehabilitation and psychiatric services into different facilities, and implemented numerous initiatives to improve patient flow. App.610:11-613:10, 646:7-647:9, 654:6-18. These efforts, however, have not solved the problem. App.654:19-655:8; App.733.

**3.**    In its search for a viable solution to its capacity constraints, Hershey came to focus on two possibilities. In 2012, as part of its regular planning process, it

considered a proposal to build a 100-bed tower (yielding a net increase of 80 inpatient beds) for approximately $277 million (in today's dollars). App.752; App.660:3-22. The tower would take 4-5 years to complete, during which time Hershey's capacity constraints would continue impairing patient care. App.584:10-15. Alternatively, Hershey could combine with Pinnacle—which has unused capacity—and optimize capacity-utilization across their campuses. The Hospitals determined that certain categories of low-acuity cases could be handled exclusively at Pinnacle, creating room for additional high-acuity patients at Hershey. App.577:17-579:21, 633:10-15, 634:24-639:11.

Believing the combination to be a vastly superior option, the Hospitals formed a Joint Integration Steering Committee and numerous subcommittees to explore other advantages of combining and to develop concrete plans for executing this transaction. App.613:11-614:3, 615:14-24, 633:16-634:23. Over countless hours, these committees concluded that the combination would alleviate Hershey's capacity constraints and yield many other major benefits for patients. Among other things, it would: directly save payors and patients money as certain low-acuity cases shift from Hershey to lower-cost Pinnacle (App.616:9-617:10); bolster the Hospitals' ability to engage in risk-based contracting (an increasingly prevalent reimbursement model requiring hospitals to offer diversified services to a broad spectrum of patients) (App.603:1-605:24, 624:21-626:2); strengthen the Hospitals' ability to compete in central Pennsylvania's rapidly intensifying healthcare market (App.573:21-574:21, 591:5-15; App.729-30); and create substantial savings by enabling the Hospitals to integrate clinical programs and business services (App.613:11-614:18).

**4.** Convinced the combination would strengthen their offerings and benefit the community, the Hospitals executed a Strategic Affiliation Agreement in May 2015. App.750. Under the Agreement, the Hospitals will operate all four campuses under the banner of Penn State Health. App.580:5-8.

After signing the Agreement, the Hospitals entered long-term rate agreements with central Pennsylvania's two largest commercial payors, Payor A and Payor B (together representing 75-80% of the Hospitals' commercial revenues).[2] The agreements will maintain existing rates and the current rate-differential between Hershey and Pinnacle, for at least five years for Payor A and ten years for Payor B. App.592:5-600:10, 618:15-621:18; App.166-67; App.745-56.

### B. *After A Five-Day Evidentiary Hearing, The District Court Denies The Government's Motion To Preliminarily Enjoin The Combination.*

**1.** The FTC and Pennsylvania Attorney General began formally investigating the combination in March 2015. In December, the FTC filed an administrative complaint alleging that the combination would violate Section 7 of the Clayton Act (15 U.S.C. § 18). Two days later, the Government filed this action under Section 13(b) of the FTC Act (15 U.S.C. § 53(b)), seeking to enjoin the combination pending the FTC administrative hearing. The Hospitals agreed to a temporary restraining order precluding the combination until the district court ruled. Over the course of the investigation and federal-court discovery, the parties produced tens of thousands of documents and took nearly 40 depositions.

---

[2] Because certain payor depositions involved information subject to a protective order (ECF 44), the Hospitals do not use payors' identities in this publicly-filed brief.

**2.**     In April 2016, the district court held a five-day evidentiary hearing on the Government's motion for a preliminary injunction.  The court heard live testimony from fifteen witnesses and saw video excerpts from a sixteenth witness's deposition.  Three of the Government's seven witnesses were proffered as experts (in economics, risk-based contracting, and hospital operations).  None of these experts had spoken to any executives or physicians at either Hospital, and they had collectively spent about two hours on the Hospitals' campuses.  The Government also called the former CEO of one of the region's smallest hospitals, an independent physician who competes with the Hospitals for patients, and a county commissioner who purchases healthcare on behalf of prisoners.  Despite centering its case on the claim that the combination would increase prices for commercial payors, the Government called only one payor, which represents just 1% of the market and is affiliated with a hospital system that competes with both Hospitals.

The Hospitals called eight witnesses in response:  five employees—executives and clinicians—involved in planning the combination, an economic expert and an expert in hospital integration, and the President of Harrisburg's Chamber of Commerce (who testified regarding the community's support for the combination).

A central issue in the hearing was the geographic market in which to analyze the combination.  In merger challenges, the plaintiff bears the burden of identifying the relevant geographic market in which the transaction's effect on competition should be assessed.  *Infra* 18.  A geographic market is an area in which consumers can rationally look for the product in question, and thus must reflect the commercial realities consumers face.  *Id.*  To define a market, courts typically utilize the "hypothetical-monopolist test."  That test asks whether "a hypothetical profit-maximizing firm that

was the only present or future producer of the relevant product(s) located in the region would impose at least a [small but significant and non-transitory increase in price (called a "SSNIP")] from at least one location, including at least one location of one of the merging firms."  D.O.J. and F.T.C., *Horizontal Merger Guidelines* § 4.2.1 (2010) ("*HMG*").  If a hypothetical monopolist in a particular area could profitably impose a SSNIP (typically, a 5% increase), that area is a valid geographic market.

Here, the Government alleged a four-county market it labeled the "Harrisburg Area," spanning Cumberland, Dauphin, Lebanon, and Perry Counties.  App.70:9-13.  The Government's economic expert opined that this market was proper because "commercial payors [would] have to pay a SSNIP to have access to … Harrisburg area hospitals" in order to satisfy patients' "demand [for] access to local hospitals."  App.71:12-21.  Representatives of the Hospitals, by contrast, testified that the Hospitals operate in a much broader area, competing for patients with many hospitals outside the four counties.  E.g., App.573:7-20, 586:1-25.  The Hospitals' economic expert summarized the import of this evidence, explaining that "the Harrisburg area … is really not the correct relevant market" given the substantial competition the Hospitals face beyond that region.  App.672:13-674:19.

The court also heard extensive testimony regarding the combination's likely effects on competition and consumers.  The Hospitals presented testimony and evidence that the combination would, among other things, provide the most effective and pro-consumer solution to Hershey's capacity constraints (e.g., App.577:17-581:20), strengthen the Hospitals' ability to transition into risk-based contracting and keep up with rapidly escalating competition in central Pennsylvania (e.g., App.573:21-576:13, 600:11-605:24), unite complementary hospitals that are not close competitors

(e.g., App.609:20-610:10), and yield hundreds of millions of dollars in savings that would directly benefit consumers (e.g., App.656:15-658:7). The Government challenged all of these points, giving the court a full opportunity to hear the parties' best evidence on every issue.

At the hearing's close on April 15, the court committed to rendering a decision by May 17—when the administrative hearing was then scheduled to begin[3]—and ordered expedited post-hearing briefing. App.675:23-676:10.

**3.**    On May 9, the court issued its opinion and order denying injunctive relief.

The court held that the Government could not show a likelihood of success because it had "failed to set forth a relevant geographic market." App.14-15. After weighing the evidence, the court found that "the FTC's four-county 'Harrisburg Area' relevant geographic market is unrealistically narrow." App.14.

The court also held that even if the Government *had* shown a likelihood of success, the Hospitals had "presented ample evidence demonstrating that anticompetitive effects would not arise through" the combination. App.15. Among other things, the court found that the combination will:

- alleviate Hershey's capacity constraints, "causing near instantaneous benefits to Hershey's patients" and enabling "both hospitals to treat more patients at the locations best suited to their healthcare needs" (App.20-22);
- "generate downward pricing pressure" by freeing Hershey from needing to construct a new bed tower (App.20);
- protect the combined Hospitals' ability to keep up with rapidly "escalating" healthcare competition in central Pennsylvania (which competition will provide a meaningful check on the combined Hospitals) (App.23-25); and

---

[3] The FTC has since continued the administrative hearing until 21 days after this Court rules. *In re Penn State Hershey Med. Ctr.*, No. 9368, Order Granting Continuance (F.T.C. June 10, 2016).

- improve the Hospitals' ability to perform under risk-based contracts, beyond their independent capabilities (App.25-26).

The court also considered the Government's interest in "effective enforcement of the antitrust laws," but concluded that this interest is "no longer as compelling" where, as here, "an injunction would deny consumers the procompetitive advantages of the merger." App.27. Ultimately, the court held that the public interest favors letting the combination proceed. App.27-28.

**4.**    The Government appealed. This Court granted an injunction pending appeal.

## SUMMARY OF ARGUMENT

The district court correctly denied injunctive relief, both because the Government failed to show it is likely to succeed on the merits and because the public equities weigh in the combination's favor.  The Government cannot show any error— let alone clear error—in the court's analysis.

**I.**    The court did not clearly err in finding that the Government failed to prove a relevant geographic market.  The Government's contrary arguments assume an essential fact that the evidence refutes.  In applying the hypothetical-monopolist test, the Government focuses on whether payors would "accept" a substantial price hike (a "SSNIP").  But it omits any showing that a SSNIP would be *profitable* for a hypothetical monopolist.  Profitability is key; if loss of customers would make a SSNIP unprofitable, an alleged market is invalid.  The Government cannot avoid this issue, and it fell far short of proving that a hypothetical monopolist of Harrisburg Area hospitals could *profitably* impose a SSNIP.

*First*, the Government did not show that hospital-payor bargaining would result in a SSNIP.  The Government recognizes that payors have leverage by virtue of the patients they represent:  a hospital demanding a substantial rate increase risks being excluded from a payor's network and losing access to that payor's enrollees.  The Government failed to prove that a hypothetical Harrisburg Area monopolist could insist on a SSNIP notwithstanding payors' leverage.

The Government tries to short-circuit this issue, claiming that payor representatives testified they would *have* to accept a SSNIP.  In fact, they said no such thing; the Government distorts their testimony beyond recognition.  Nor did the Government prove that patient demand for a hypothetical monopolist would supply the leverage needed to impose a SSNIP.  It claimed that patients living in the

Harrisburg Area would demand that payors include Harrisburg Area hospitals in their networks. But the court correctly found—based on an abundance of evidence—that many outside hospitals are reasonable alternatives for a large number of patients who otherwise would seek care in the Harrisburg Area.

As in the district court, the Government's arguments reflect a one-sided view of the facts. It considers the preferences only of patients who live in the Harrisburg Area, insisting it makes no difference how many *other* patients travel *into* that area for care and could switch to outside alternatives. The court correctly rejected this rigged approach to market definition, recognizing that a geographic-market analysis must account for the potential patients of Harrisburg Area hospitals—without excluding the patients for whom outside hospitals compete as well.

*Second*, the Government also failed to show that a SSNIP would not be rendered unprofitable by patients switching to outside hospitals. In the Harrisburg Area, a 5% price increase would not be profitable if more than about 7% of patients would be lost. This would prevent a profit-maximizing firm from imposing a SSNIP even if it could. But instead of trying to *prove* that this many patients would not switch, the Government *assumed* that a SSNIP would not affect patients' hospital choices. To the contrary, the evidence showed that patients here are increasingly price-sensitive, and that payors have tools to "steer" patients toward lower-cost hospitals.

Because it cannot show clear error, the Government tries to transform market analysis into a legal issue subject to de novo review. That effort fails; market analysis is a factual issue, and all of the Government's objections challenge fact-findings. Those objections are also invalid. *First*, the court did not "wholly ignore[]" payors. Br.26. Because payors and patients are directly linked, the court was entirely correct

to consider the Hospitals' patients and the alternatives to which they could turn. *Second*, the court's findings are not affected by analysis of a SSNIP imposed only at Pinnacle. Br.27. The Government never offered a Pinnacle-only-SSNIP analysis, and failed to show that a Pinnacle-only SSNIP could be imposed profitably notwithstanding the facts found by the court. *Third*, in claiming that the court's market analysis was "bas[ed]" on the Hospitals' rate agreements, the Government simply misrepresents the opinion below. *Id.*

**II.** The court also did not clearly err in finding that the equities support the combination because it will yield substantial procompetitive benefits by: immediately resolving Hershey's capacity constraints without costly construction of a new bed tower; strengthening the Hospitals as participants in rapidly intensifying competition with other hospitals; and helping the Hospitals adapt as the industry embraces risk-based contracting. The Government's challenges all fail because they second-guess the district court's credibility determinations, miss the key distinction between hospital beds (capacity) and hospital services (output), fail to address important differences that prevent the Hospitals from competing closely with each other, and repeatedly mischaracterize and even outright misstate what the opinion says.

The Government incorrectly claims that the combination (and its accompanying public benefits) will be preserved through the Hospitals' perseverance in the administrative proceeding. The Hospitals have made clear that, if the combination is preliminarily enjoined, they will have to abandon the transaction and its significant public benefits. The Government, by contrast, has not shown any particular problem it would have unwinding the combination if needed. The court was right to conclude that enjoining the combination would not be in the public interest.

## STANDARD OF REVIEW

The Government's arguments challenge findings of fact. Thus, the standard of review is clear error. *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013). A fact-finding is clearly erroneous only if it is "completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." *F.T.C. v. Lane Labs-USA, Inc.*, 624 F.3d 575, 582 (3d Cir. 2010). This Court does not set aside a fact-finding unless, after "giving all deference to the opportunity of the trial judge to evaluate the credibility of witnesses and to weigh the evidence," it is "left with a definite and firm conviction that a mistake has been committed." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 360 (3d Cir. 2007).

## ARGUMENT

The district court correctly denied injunctive relief.  It is "'essential that the FTC identify a credible relevant market before a preliminary injunction may properly issue,' because a merger's effect cannot properly be evaluated without a well-defined relevant market."  App.9 (quoting *F.T.C. v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999)).  The court's dispositive finding that the Government failed to carry that burden is correct and should be upheld.

Even if the Government had carried its market-definition burden, denying the injunction still would have been proper.  Where a plaintiff establishes a presumption of illegality based on concentration in a relevant market, the defendants may present evidence that "casts doubt on" or "undermine[s] the predictive value of" the Government's market-share statistics.  *F.T.C. v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991); *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 715 n.7 (D.C. Cir. 2001).  The plaintiff then must produce additional evidence of anticompetitive effects to carry its ultimate burden.  *Heinz*, 246 F.3d at 715.  And even where a plaintiff shows a likelihood of success, the court still must "weigh the equities in order to decide whether enjoining the merger would be in the public interest."  *Id.* at 726.  Here, the court found that multiple considerations—beyond the Government's failure to prove its alleged market—warranted denying injunctive relief.  App.28.  Those findings are also correct and should be upheld, if necessary, as alternative grounds for affirmance.

## I.    The District Court Did Not Clearly Err In Finding That The Government Failed To Establish A Valid Geographic Market.

A relevant geographic market "is that area in which a potential buyer may rationally look for the goods or services he seeks."  *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005).  "The geographic scope" of such a market "is a question of

fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry being considered." *Id.*

There is no exception here—market-definition in this case is a straightforward factual dispute. The parties agree on the framework for analyzing the alleged market. And there is no disagreement that both payors and patients play important roles in hospital competition. All agree that hospitals need contracts with payors *and* patients to serve. Payors and hospitals bargain over prices, and the outcome depends on relative bargaining strength—which, in turn, depends on the number of patients a payor covers and on hospitals' relative attractiveness to those patients. Br.7-9. With prices set in bargaining, the volume of services provided by each hospital depends, again, on their relative attractiveness to patients. Br.6.

Against this agreed backdrop, the only dispute here is factual. The Government's own hypothetical-monopolist test turns on (1) whether a hypothetical monopolist would be *able* to overcome payor leverage and impose a SSNIP, and (2) whether a hypothetical monopolist would *want* to impose an increase despite the risk of losing patients. Both points depend—at least in large part—on the factual question of how strongly patients prefer hospitals inside the alleged market over hospitals outside of it.

Accordingly, the district court based its decision on a factual finding that hospitals outside the alleged market offer reasonable alternatives for many patients. App.12-13. This approach was fully consistent with the Government's *Guidelines*, with legal precedent (both old and new), and with the well-understood roles of both payors and patients. The only real dispute is whether the court's factual finding was clearly erroneous—and it was not.

### A.    *The Government Failed To Show That The Harrisburg Area Is A Relevant Geographic Market.*

The Government had the burden to establish a geographic market in which to analyze the combination. *Gordon*, 423 F.3d at 211-12. The district court, however, "f[ou]nd based on the hours of testimony and thousands of pages of exhibits presented by the parties and considered by th[e] Court, that the FTC's four county 'Harrisburg Area' relevant geographic market is unrealistically narrow and does not assume the commercial realities faced by consumers in the region." App.14. Far from being clearly erroneous, that finding was clearly correct.

### 1.    The Hypothetical-Monopolist Test Requires Assessment Of Whether A SSNIP Would Be Profitable.

The district court properly analyzed the Government's alleged market using the hypothetical-monopolist test. App.10. That test "asks whether a hypothetical monopolist in a proposed geographic market … could *profitably* impose a" SSNIP. Br.17 (emphasis added). The profitability requirement is essential. Theoretically, any seller can "impose" a SSNIP by refusing to set a lower price. The question is whether the SSNIP would cause a volume reduction that renders the increase unprofitable for the monopolist. *E.g.*, *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 (6th Cir. 2014). If so, the monopolist would need to control a *broader* market in order to *profitably* impose a SSNIP.

The Government initially states the test accurately but then—in its very next sentence and for the remainder of its analysis—omits the key profitability element when applying the test. Br.17-18. According to the Government, if "a monopolist in the four-county Harrisburg area could impose a SSNIP," "the Harrisburg area is a

proper antitrust geographic market." Br.18. The Government never asserts, much less demonstrates, that the monopolist would profit from a SSNIP.

The Government does not—and cannot—argue that the test should be applied without considering profitability. The only explanation for its omission, therefore, is a wish to *assume* that a hypothetical Harrisburg Area monopolist could *profitably* impose a SSNIP. But assumptions will not suffice. And the Government failed to prove that a profitable SSNIP would occur.

In the market for inpatient hospital services, there are two primary reasons a profitable SSNIP might not occur. *First*, both hospitals and payors "have some amount of bargaining power, or 'leverage,' and the agreement reached depends on the relative strengths of that leverage." Br.7. If outside hospitals are viable alternatives for patients, hypothetical monopolization of an alleged market would not cause a leverage shift that enables a SSNIP to be "imposed" on payors.

*Second*, if a SSNIP would cause enough patients to substitute away from the hypothetical monopolist's hospitals, it would be unprofitable. *HMG* § 4.1.3. Payors have many tools for "steering" patients away from high-cost hospitals, and patients could also decide on their own to go to lower-cost hospitals. The hypothetical monopolist would not need to lose many patients for a SSNIP to become unprofitable; the Hospitals' economic expert calculated that losing just 7.1% of the combined Hospitals' patients would defeat a 5% price increase. App.785 ¶ 55.[4]

---

[4] Although the Government has contended that this "critical-loss analysis" is "inappropriate for defining hospital markets" (Gov. Post-Hearing Br.8 (Apr. 25, 2016)), courts consistently rely on that mode of analysis—which the Government's own *Guidelines* expressly endorse. *E.g.*, *Tenet*, 186 F.3d at 1050; *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1129 (N.D. Cal. 2001); *United States v. Mercy Health Servs.*, 902 F. Supp. 968, 981 (N.D. Iowa 1995), *vacated on other grounds*, 107 F.3d 632

(continued)

Regardless of whether payors would accept a SSNIP, a profit-maximizing hospital monopolist would not propose one if this level of patient loss were anticipated. (Or, alternatively, the monopolist would respond to such losses by revoking the increase, preventing it from being "non-transitory.")

The Government proved *neither* that hypothetical monopolization of its alleged market would strengthen hospital bargaining leverage so that a SSNIP would result, *nor* that a SSNIP would be profitable despite patient-diversion to outside hospitals.

## 2.    The Government Failed To Show That Bargaining Would Result In A SSNIP.

**Bargaining Leverage.**  In addressing hospital-payor bargaining leverage, the Government again attempts to lower the bar by asking the wrong question.  It frames "the relevant question" as whether payors "would pay a higher price to one of defendants' hospitals rather than attempt to market a network to Harrisburg-area consumers that includes no Harrisburg-area hospitals." Br.34.  On its face, this question assumes "bargaining" where both sides openly believe the hospital is willing to walk away but the payor is not.  This ignores the fact that leverage exists on *both* sides of the table.

In bargaining, payors have their own substantial leverage:  "if the hospital demands too high a price and the insurer abandons the negotiation, the hospital will lose access to most of that insurer's members." Br.6-7.  Indeed, as Payor A's representative confirmed in his deposition, his employer "has considerable leverage" by virtue of its large enrollment, and "any provider … has to deal with that reality, if it

---

(continued…)

(8th Cir. 1997); *HMG* § 4.1.3 ("The 'critical loss' is defined as the number of lost unit sales that would leave profits unchanged.").

got to the point where they would consider dropping out of our network." App.703 (125:19-126:13). The Hospitals' economic expert similarly explained that "mutually assured destruction" deters hospitals (and payors) from being overly insistent in bargaining. App.666:13-668:11. Each party is constrained by the other, even if neither of them rationally would kill a deal (or make "a nuclear threat"). App.667:15-19.

It therefore is not enough to argue that a payor would "rather" accept a SSNIP than have a plan with no Harrisburg Area hospitals. Br.26. Even if this were true, it well might also be true that a hypothetical monopolist would "rather" *forego* a SSNIP than lose the payor's enrollees as patients. A rational party would not simply accept a demand for a SSNIP without attempting to exercise its *own* leverage to reach a better outcome. App.702 (121:6-122:15). The correct question, then, is whether hypothetical monopolization would generate a change in hospital leverage that would result in a SSNIP. The answer here is no, and more importantly, the Government did not prove otherwise.

**Payor Testimony.** After posing the wrong question, the Government purports to answer it by mischaracterizing payor testimony. Payors did not "testify that, post-merger, they *would* pay a combined Hershey/Pinnacle in excess of a SSNIP in order to keep those hospitals in their network." Br.18 (emphasis added). Indeed, the Government did not even ask payors to speculate whether they *actually* would end up paying a SSNIP, as opposed to whether they would be *willing* to do so if they had no leverage. Payors' *actual* testimony does not support the Government's position.

*First*, the Government cites over and over (and over) again to the testimony of a Payor A representative. According to the Government, the witness testified that

Payor A "would have no realistic alternative but to pay prices 25 percent higher to keep [the combined Hospitals] in the network." *Id.* 16; *see also id.* 38, 40, 46. The actual testimony is to the contrary.

Payor A signed an agreement with the Hospitals "protect[ing] [it] from any potential risk of demands from the combined entity for higher reimbursement rates" for five years. App.682 ¶13. Asked what "*formal* protection from potential increases" Payor A would have "five years from now," the representative testified that Payor A could complain to the insurance department if "theoretically" the Hospitals sought a 25-percent increase. App.493 (91:16-25) (emphasis added). The Government then asked the witness to confirm that "you wouldn't have any other leverage to resist that if that were to happen." *Id.* 92:1-3. He *disagreed:* "We could certainly engage some of our major accounts … and try to use pressure from that standpoint …." *Id.* 92:4-7. The Government backtracked and asked whether there merely was "some concern" about "higher prices five years from now." *Id.* 92:10-13, 21-24. Even to this, the Government elicited only that "[t]hat's always a possibility." *Id.* 92:25.

The Government also carefully avoids mentioning this witness's recognition of Payor A's leverage over hospitals. It repeatedly mentions only the representative's testimony that Payor A would lose members if it did not have the Hospitals in-network, omitting the accompanying testimony that Payor A nevertheless "could" walk away and pull its volume from the Hospitals. App.705 (144:6-10). The representative agreed that Payor A "has considerable leverage over the providers as well because of the members it brings to those providers … [a]nd that's not going to change as a result of the transaction." App.703 (125:24-126:18). Thus, while the Government focuses exclusively on the notion that payors could have something to

lose without a deal, that in no way means a SSNIP would result. As the Hospitals' economic expert explained, "you just can't look at one [side's leverage] validly without looking at the other." App.667:15-668:11.

*Second*, no other payor representatives testified that their employers would accept a SSNIP, either. The Government thus falls back to assertions about alleged payor "concern" over potential price increases. Br.38. Mere concern would not be enough, and regardless, the Government overstates this deposition testimony, too. There was not "undisputed testimony that insurers, even the largest ones, were concerned that the merger *would force* them to pay increased prices." Br.38 (emphasis added). Payor A's representative expressed "concern" only that a price increase is "a possibility." App.493 (92:21-25). Similarly, Payor B's representative testified only that rate increases "would be one possible outcome," with another possibility being that "the rates would stay relatively the same [as] where they are." App.802 (120:12-18). That testimony belies yet another attempt by the Government to distort the evidence: A document it cites four times was merely Payor B's calculation of the amounts that would be involved *if* Pinnacle's prices were raised to Hershey's level—not an "estimate[] of harm" expected to occur. Br.20, 17, 42, 45; App.246.

*Third*, the Government fares no better in invoking its so-called "natural experiment," involving Payor E (the area's smallest payor), which has neither Hospital in-network. Br.13-14, 38. As Payor E's representative testified, Pinnacle ended their arrangement because Payor E's 1% market share "was not significant enough" to justify "the administrative oversight that's required … to manage the contractual relationship." App.51:14-20. Contrary to the Government's central theory, Payor E did not attempt to keep Pinnacle in-network by offering a rate increase. Instead, it

offered a purported "increase" offset by volume-based discounts that could, on net, *decrease* Pinnacle's rates.  App.552:17-557:18.  If anything, this "experiment" involving a single, uniquely small payor *undermines* the Government's claim that payors inevitably would accede to a SSNIP.

At most, the payor evidence trumpeted by the Government amounts to *some* general "concern" over the theoretical *possibility* of *some* price increase.  This fails to demonstrate that payors—much less all or almost all payors—*would* accept a SSNIP. In fact, the evidence confirms that payors' leverage would work *against* a SSNIP.

**Commercial Realities.**  The Government's arguments about patient demand similarly fail to show that bargaining would result in a SSNIP by a hypothetical Harrisburg Area monopolist.

Most fundamentally, the Government failed to prove its premise that a sufficient number of patients "demand" local care.  E.g., Br.39-40.  The Government relied primarily on the statistic that 91% of patients *residing in the Harrisburg Area* are treated at Harrisburg Area hospitals, along with similar evidence of how far those patients travel for care.[5]  But as the court correctly found, the evidence "controvert[ed] the FTC's assertion that GAC services are 'inherently local.'"  App.12-13.  Most importantly, the court noted "the uncontroverted fact" that 43.5% of Hershey's patients—11,260 people—and "several thousand of Pinnacle's patients" travel from outside the four-county Harrisburg Area.  App.12.  These patients defied any notion

---

[5] The Government also states that a survey of 1,000 Harrisburg Area residents shows "convenient location was consumers' most important factor in selecting a hospital" (Br.12), but this reflects the view of just 22% of respondents (i.e., roughly 220 Harrisburg Area residents).  App.803-06.

of insistence on local care, as a substantial number *do* travel for inpatient hospital services:  half traveled at least 30 minutes, and 20% traveled over an hour.  App.12.

The evidence—including the Hospitals' own ordinary-course documents—also showed that the Hospitals compete with many hospitals outside the Harrisburg Area.[6] And as the district court noted, there are 19 hospitals within a 65-minute drive of Harrisburg—"many of [which] are closer to patients who now come to Hershey." App.13.  *Accord Gordon*, 423 F.3d at 212 (affirming rejection of plaintiff's alleged market, "approximately 21% of the Hospital's patients for outpatient cataract surgery live closer to other facilities yet chose [the defendant] Hospital").[7]

The Government failed to refute this evidence that many relevant patients do *not* demand local care and that both Hospitals compete with non-Harrisburg Area hospitals, which "provide a realistic alternative that patients would utilize."  App.13. The district court's finding—that the Government did not prove sufficient patient insistence on local hospital care—was firmly grounded in the evidence.

---

[6] *See, e.g.*, App.725-26 (Hershey competitors outside Harrisburg Area:  UPMC, Penn, Thomas Jefferson, Temple University, Hopkins, Geisinger Health System); App.710-21 (UPMC, Penn, Hopkins); App.573:7-20 (UPMC, Penn, Thomas Jefferson, Hopkins, Geisinger); App.697-700 (Pinnacle competitors outside Harrisburg Area: WellSpan York, Lancaster General); App.690-95 (same); App.586:1-25 (WellSpan York, Lancaster General, Lancaster Regional, Heart of Lancaster Regional).  Rival hospitals outside the Harrisburg Area also recognize that the Hospitals compete beyond that area.  E.g., App.689; App.734-48; App.767 (169:5-170:16); App.740; App.678.

[7] In previously concluding that evidence of some customers traveling longer distances did not dictate broadening the market "as a matter of law" (*Houser v. Fox Theatres Mgmt. Corp.*, 845 F.2d 1225, 1229-30 n.10 (3d Cir. 1988)), this Court in no way suggested that such evidence would *never* support a fact-finding on an alleged market's validity.  Br.41.  Indeed, market definition "is a question of fact to be determined in the context of each case."  845 F.2d at 1229-30 n.10 (citation omitted).

**Government's Improper Focus.**  The Government also overstates the demand for local care by focusing only on patients in the Harrisburg Area, while insisting that patients who travel into that area for care are irrelevant.  The Government thereby seeks to consider only the patients who may be relatively more likely to want the hypothetical monopolist in their payors' networks.  But hospitals cannot price-discriminate based on where patients reside, and thus any rate increase for Harrisburg Area residents would also apply to residents outside that area.  App.588:2-589:12, 622:2-14; App.706 (155:15-156:5).  Because a SSNIP would apply to *all* patients, a payor's response to a proposed SSNIP would be influenced by the preferences of *all* its enrollees.

The Government's contrary theory has no limiting principle.  According to the Government, it matters only whether a subset of patients—however small—lives near a group of hospitals and prefers to receive care there; if so, the area encompassing the hospitals and those nearby patients is a relevant market.  Such a "gerrymander[ed]" market, based only on a subset of patients, is untenable:

> Using [this] logic, we could delineate the relevant geographic market as the square mile surrounding a hospital, the block on which a hospital sits, or even a hospital building where the relevant procedure takes place.  Surely a sufficiently large percentage of people in this area use the hospital's services.  These "geographic markets," however, are obviously too narrow.

*Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 599 (8th Cir. 2009).  The Government failed to establish its narrow market by alleging merely that patients living in the Harrisburg Area prefer local care.

The Government also cannot prove its broad generalization that employers in the Harrisburg Area would demand local hospitals when selecting among health plans.  For this proposition, the Government cites the statements of just two employers:  one

which operates solely in Dauphin County, and another with locations only in Harrisburg and Mechanicsburg, about eight miles away. Br.13; App.289-94. Even if credited, such evidence would be insufficient to show widespread insistence on Harrisburg Area coverage.[8] And this only underscores that there is no evidence of such insistence by employers located *outside* the Harrisburg Area. Ultimately, the Government's generalizations about employers are difficult to square with the fact that the Harrisburg Chamber of Commerce—whose "1,100 members employ about 100,000 people in the region"—has "adopted a formal position of support for the combination." App.661:16-19, 662:11-16.

Similarly, the Government did not prove its generalizations about the marketability of insurance plans in the Harrisburg Area. It again mischaracterizes the record, claiming that "even the largest insurers in the Harrisburg area *would not try* to sell a network that includes neither Hershey nor Pinnacle." Br.15 (emphasis added). In fact, a Payor A representative testified that "*we would certainly market a product*" without the Hospitals, and merely noted that the product "would have challenges." App.465 (71:19-72:10) (emphasis added). A Payor B representative similarly acknowledged that marketing a product without the Hospitals "would be a challenge," but clarified that "it's not my role to define marketability." App.800 (64:21-65:9). This testimony again falls far short of the Government's portrayal.

The Government thus failed to prove *any* of the predicates needed to show that the monopolization of its alleged market would produce changes in bargaining leverage that would result in a SSNIP.

---

[8] Moreover, the latter employer's preference for plans that include the Hospitals has not stopped it from *supporting* the combination. App.679 ¶2.

### 3.    The Government Failed To Show That A SSNIP Would Not Result In Patients Turning To Realistic Alternatives.

The Government also failed to prove that a SSNIP would be profitable despite patients switching to hospitals outside the alleged market. A payor reimburses a hospital only when the hospital actually treats the payor's enrollees. If enough patients would choose not to seek care from the hypothetical monopolist because of a rate increase, that increase will be self-defeating. Here, given the many patients the Hospitals draw from outside the Harrisburg Area—and the many alternatives to which those patients could turn—the Government did not carry its burden of showing that patient loss would not cross the low threshold (7.1%) needed to defeat a SSNIP. App.12-13; *supra* 19. Thus, the Government did not show that a profit-maximizing hypothetical monopolist would impose a SSNIP even if it had the leverage to do so.[9]

The Government seeks to avoid this issue entirely, baldly asserting that "price plays little role when patients choose between in-network hospitals." Br.40. Instead of evidence, the Government invokes a Ninth Circuit decision for the supposed "marketplace reality" that "patients 'would not change their behavior in the event of a SSNIP.'" Br.40-41 (quoting *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 785 (9th Cir. 2015)). But the Ninth Circuit did not take judicial

---

[9] One-time "imposition" of a price increase would be insufficient anyway. Br.27-28. If the hypothetical monopolist imposed the SSNIP because it underestimated patient losses, the SSNIP would not have been *profitably* imposed. In addition, hospitals and payors must deal with one another regularly; if a payor accepts a SSNIP in one bargaining cycle but subsequently sees enrollees divert to other hospitals (or to other payors), it may well reject any similar pricing in the next round of bargaining. A price increase "imposed" once is not a SSNIP, which must be non-transitory. *HMG* § 4.1.1; Br.17.

notice of some incontrovertible truth that applies in all circumstances.  Rather, it determined only that the district court in that case had not clearly erred by crediting evidence regarding the behavior of consumers relevant to that case—patients of Idaho primary-care physicians.  778 F.3d at 785.  The court here was correct not to consider itself bound by the District of Idaho's fact-finding involving a market for a different healthcare product on the other side of the country.

The evidence *in this case* shows that patients are far from impervious to price increases.  When hospitals increase rates for payors, that increase is passed onto patients in the form of higher out-of-pocket expenses (not to mention higher premiums).  App.559:9-14; App.261 ¶18; App.274 ¶14.  Payors in this case consistently recognized that patients are becoming increasingly sensitive to changes in the prices they pay.  App.706 (156:6-158:22); App.754 (86:3-87:4); App.773 (266:16-267:10); App.759 (91:11-92:14).  Moreover, payors are able to utilize that sensitivity as a means of steering patients away from certain hospitals, consistent with the payor's financial interest.  App.561:10-20, 587:8-588:24, 669:9-671:10.  Payors can use tiered networks (in which certain in-network hospitals are cheaper than others), co-pays, co-insurance, high-deductible plans, price-transparency tools, and other means of ensuring that patients feel the cost of going to higher-cost hospitals.  App.706 (156:6-158:22); App.773 (266:16-267:10); App.759 (91:11-92:14); App.587:8-588:24.  A payor would have every reason to use these tools in response to a SSNIP.

The Government did not show that a SSNIP would be profitable despite the volume of patients who would rationally turn to hospitals outside the alleged geographic market in response to a rate increase.  Nor did it prove that hypothetical monopolization of the alleged market would produce a SSNIP through changes in

bargaining leverage.  The district court thus correctly found that the Government had failed to prove its alleged market using the hypothetical-monopolist test.

## B.  *The Government's Attacks On The District Court's Market Analysis All Fail.*

Recognizing it cannot overcome the clear-error standard, the Government attempts to transform market analysis into a set of legal issues subject to de novo review.  It argues that the district court "committed three independent legal errors" by (1) "completely ignor[ing] … the role of insurers;" (2) "fail[ing] to examine" whether a SSNIP could be imposed only at Pinnacle; and (3) "bas[ing]" its market analysis on the Hospitals' rate agreements with the area's two largest payors.  Br.26-28.

These attacks all fail, primarily because they misstate what the court actually did.  The court properly relied on evidence of patients' behavior, which the Government agrees is the driver of payor bargaining.  The court's findings apply equally to the possibility of a Pinnacle-only SSNIP, and the Government never offered a Pinnacle-specific analysis suggesting otherwise.  And the Government simply miscasts the court's discussion of the rate agreements, which the court did not use as a basis for its market analysis.

Even if the Government *could* identify flaws in the court's market analysis, it could not properly characterize them as "independent legal errors" that each "justify reversal."  Br.26.  The geographic market's scope is a question of fact.  *See, e.g., Gordon*, 423 F.3d at 212; *Borough of Lansdale v. Phila. Elec. Co.*, 692 F.2d 307, 312 (3d Cir. 1982) ("[W]e reject Lansdale's contention that the geographic market issue should be resolved as a matter of law.").  And, contrary to the Government's claim, this Court never has suggested that "analytical flaws" in market definition are errors of law.

Br.30 (quoting *Allen-Myland, Inc. v. Int'l Bus. Mach. Corp.*, 33 F.3d 194, 201-04 (3d Cir. 1994)).

Alleged "analytical flaws" in fact-finding are not separate issues at all, as the Government implicitly recognizes. Br.1-2. Indeed, the Government's recent motion for an injunction pending appeal raised the same alleged flaws but acknowledged that clear-error review applies. Appellants' Mot. for Inj. Pending Appeal at 2, 14, 16. Even where such flaws exist, therefore, they would justify overturning a fact-finding only if, with the flaw revealed, the finding is "completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." *Lane Labs-USA*, 624 F.3d at 582. *Cf. Weiss v. York Hosp.*, 745 F.2d 786, 825 (3d Cir. 1984) ("Market definition is a question of fact, … and we therefore must affirm the jury's conclusion unless the record is devoid of evidence upon which the jury might reasonably base its conclusion.").

"Though cloaked as a legal argument, the FTC really challenges the district court's weighing of the relevant market factors, which this court reviews for clear error." *F.T.C. v. Lundbeck, Inc.*, 650 F.3d 1236, 1239 (8th Cir. 2011). As demonstrated below, the Government has not shown defects in the district court's market analysis. Much more to the point, the Government has not shown clear error—or error at all—in the court's geographic-market finding.

### 1. The Court Did Not Ignore Payors.

The district court did not "wholly ignore[]" payors. Br.36. Indeed, it would be impossible to consider patients and hospitals without considering payors. As the Government's economic expert put it, payors and patients are "intimately linked"; patients' "preferences are ultimately a major driver" of leverage in hospital-payor

bargaining.  App.66:14-20.  Hospitals seek inclusion in payor networks so they can attract the payor's enrollees as patients, and payors seek to include hospitals in their networks so they can attract the hospitals' patients as enrollees.  Br.5-6.  It is therefore nonsensical to suggest that evidence and findings about patient preferences have nothing to do with payors.  Indeed, the Government itself relied heavily on statistics about where patients living within its alleged market actually go for hospital care.  *E.g.*, App.71:12-74:13.[10]  The court hardly can be faulted for looking at the same type of statistics in finding that the Government had not proven its fundamental premise.

Indeed, the court's decision fits well within the body of caselaw recognizing that payors "are to a large extent, the true consumer of acute inpatient services," but nevertheless "identify[ing] other hospitals to which patients residing in the service areas could turn if they were dissatisfied with the prices or services of the merging hospitals."  *Sutter*, 130 F. Supp. 2d at 1124, 1129.[11]  When this evidence shows that

---

[10] The Government cannot avoid the payor-patient connection by parsing "direct" and indirect customers (Br.6) or by slicing the market to define the *product* as general acute care ("GAC") services "sold to commercial payors" (Br.21).  As the Government recognizes, "the market for hospital services" includes hospitals, payors, and patients (Br.5); and as it alleged in its Complaint, "[t]he relevant service market … is GAC inpatient hospital services sold to commercial health plans *and their members*."  ECF 101 ¶23 (Unredacted Compl.) (emphasis added); *see also* App.558:13-18 (Government's economic expert:  "relevant product market" is "GAC services … provided to commercially-insured patients").

[11] *See also, e.g., Tenet*, 186 F.3d at 1049, 1053-54 (noting that payors bear the risk of price increases, but concluding that the "proximity of many patients to hospitals in other towns … shows that the FTC's proposed market is too narrow"); *F.T.C. v. Freeman Hosp.*, 69 F.3d 260, 270 n.14 (8th Cir. 1995) (acknowledging that "the term 'consumers' often means … third-party payors," but looking to "where patients could practicably turn for alternative sources of acute care inpatient hospital services"); *Gordon v. Lewistown Hosp.*, 272 F. Supp. 2d 393, 422, 428 (M.D. Pa. 2003) (recognizing that "a majority of [healthcare] costs … are paid by third-party payers," but rejecting market that did not account for "what patients could have done in the event the Hospital attempted to lower quality or output"), *aff'd*, 423 F.3d 184 (3d Cir. 2005).

patients have sufficient outside alternatives to a hypothetical monopolist within an alleged market, courts routinely reject that market as too narrow. *E.g., Tenet*, 186 F.3d at 1054; *Freeman*, 69 F.3d at 271-72; *Gordon*, 423 F.3d at 212. These decisions are entirely consistent with the Government's preferred decisions—none of which involved a merger of two hospitals where the geographic market was disputed— purportedly analyzing mergers "through the lens of contract negotiations." Br.36 n.6; States' Am.12-13. The different outcomes in the cases are the result of different facts, not some sudden discovery of how healthcare bargaining works.

Here, the court's finding that patients have sufficient outside alternatives is the opposite of "sheer speculation." Br.39. That finding has overwhelming support in the record, including evidence of: competition with outside hospitals; location of outside hospitals nearly as close or closer to many patients; growing price-sensitivity of patients; and steering mechanisms available to payors. *Supra* 24-25, 28-30. And for its part, the Government "cite[s] no record evidence that [] patients [outside the Harrisburg Area] would [*not*] use other hospitals if Hershey and Pinnacle raised their prices." Br.39. Instead, it improperly disregards those patients entirely. Given the outside options for many patients (whose preferences drive payor negotiations), the court was entirely correct in concluding that "the FTC has created a geographic market that is too narrow." App.13.[12]

---

[12] The Government and its amici argue that, by considering patients' behavior, the court "essentially applied" the purportedly "discredited 'Elzinga-Hogarty' test." Br.40 n.7; States' Am.12-14; Econ. Am.11-18. That is wrong. Elzinga-Hogarty analysis has been given less weight because it purports to define a market simply as an area meeting certain thresholds for *current* patient flow, without reference to where patients reasonably *could* go. *See, e.g., Freeman*, 69 F.3d at 264-65 & n.9; *id.* at 269 ("[T]he Elzinga-Hogarty analysis presented in this case did not, by itself, address the decisive question of where consumers could practicably go for alternative sources of

Furthermore, the court did not err by declining to discuss the payor evidence the Government tries repackaging here. If the Government believed the payor testimony was pivotal, it could have called payor representatives to testify at the hearing (as it usually does in hospital-merger challenges), precisely so that the court could assess their credibility. Instead, it called only the market's smallest payor, who is affiliated with a competitor of both Hospitals. The reason for this is that no payors *without* a conflict of interest oppose the combination.

In any case, as demonstrated above, the payor evidence does not support the Government's position. *Supra* 21-24. The court's decision was "based on the hours of testimony and thousands of pages of exhibits presented by the parties and considered by this Court" (App.14), and "[t]he fact that the district court did not in its opinion recite every piece of evidence does not mean that the evidence was not considered." *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1343 (Fed. Cir. 2003) (citation omitted).

The Government also argues that, regardless of what patients outside the market do, "insurers wishing to sell policies to the substantial population of the four-county Harrisburg area must have Harrisburg-area hospitals in their networks—and would

---

(continued…)

[care]."); *see also Tenet*, 186 F.3d at 1052 ("Th[e] evidence must address where consumers could practicably go, not [] where they actually go."). The district court did not silently apply the Elzinga-Hogarty test; instead, it *rejected* the *Government's* assertion that GAC services should be deemed "inherently local" based on where a subset of patients (Harrisburg Area residents) currently go. App.11-13. And the court did not stop when it found that many thousands of the Hospitals' patients (those living outside the Harrisburg Area) *currently* go longer distances for hospital care. Instead, it proceeded to make findings as to where patients reasonably *could* go. App.13 ("[I]f a hypothetical monopolist such as the combined Hospitals imposed a SSNIP, [many] other hospitals would readily offer consumers an alternative."); App.13 (noting "realistic alternative[s] that patients would utilize").

pay significantly increased prices in order to keep them." Br.39. But this is backwards. Because a hypothetical monopolist cannot geographically price-discriminate, it could not impose a SSNIP for Harrisburg Area patients without simultaneously jeopardizing the substantial business it otherwise would draw from outside the alleged market. And, as explained above, this risk of patient loss also would affect the bargaining dynamic between the hypothetical monopolist and payors. It is the patients with reasonable outside options who keep the hypothetical monopolist in check—not the patients who, to hear the Government tell it, would be beholden to that entity.

### 2. The Government's Argument Regarding A Pinnacle-Only SSNIP Lacks Merit.

The Government fares no better in claiming that the district court "failed to apply the hypothetical monopolist test to Pinnacle's hospitals." Br.42. In its post-hearing brief below, the Government devoted all of three sentences to the notion of a Pinnacle-only SSNIP. Gov. Post-Hrg. Br.10. It did not suggest that *its* geographic-market analysis would differ if a potential SSNIP were limited to Pinnacle. Similarly here, it argues only that the court's analysis does not square with a Pinnacle-only assessment. But that argument is based on the same erroneous premise that the district court "ignored" payors. Because the court's analysis is fully consistent with the respective roles of patients *and* payors, its finding is unaffected by the notion of a Pinnacle-only SSNIP.

A Pinnacle-only analysis makes no difference, for a simple reason: the Government does not and cannot suggest that payors and hospital systems engage in separate bargaining for each hospital within a system of hospitals in the same area. This means that bargaining leverage depends on the attractiveness of a hypothetical

monopolist's *system*, not any particular hospital. And the attractiveness of a hypothetical monopolist's system depends on the preferences of *all* of a payor's enrollees, not just those who prefer a particular hospital. The Government has identified no authority for the proposition that, in a hospital-merger case like this one, it matters whether the hypothetical-monopolist analysis is performed separately for each hospital.

Furthermore, the Government is wrong in implying (Br.39, 42) that the court's analysis was limited solely to Hershey's patients. The court found that "the FTC has created a geographic market that is too narrow because it does not appropriately account for where *the Hospitals*, particularly Hershey, draw their business." App.13 (emphasis added). The observation that this was "particularly" true for Hershey reinforces that it was also true for Pinnacle. In fact, the court specifically cited evidence that "several thousand of Pinnacle's patients reside outside of the Harrisburg Area." App.12. This includes patients in York and Lancaster Counties, where a number of the "realistic alternative[s]" recognized by the district court are located. App.13; App.586:1-25. Thus, the court properly considered patients of both Hospitals.

### 3. The Court Did Not Base Its Market Analysis On The Hospitals' Rate Agreements With The Area's Two Largest Payors.

The Government's final alleged error is similarly illusory. According to the Government, the district court "based its analysis of the geographic market on private price agreements between defendants and two large insurers." Br.43; *see also* Econ. Am.18-20. This argument is predicated on a misreading of the court's opinion.

As the court noted, the Hospitals have entered agreements with central Pennsylvania's two largest commercial payors, which collectively represent 75-80% of

commercial revenues. App.13-14. The agreements require the Hospitals to maintain existing rates—and preserve the existing Hershey-Pinnacle rate-differential—for at least five years for Payor A, and ten years for Payor B. App.13-14.

The fact that the court considered these agreements does not mean it used them to conduct the hypothetical-monopolist test—and the court in fact said nothing of the sort. Instead, it said only that, "when considering *the import* of the hypothetical monopolist test," one "simply cannot be blind to th[e] reality" that "the Hospitals cannot walk away from these payors and that rates *cannot increase* for at least 5 years." App.14 (first emphasis added). The court did not say the agreements prove that the Government's alleged geographic market is invalid. It had already reached that conclusion earlier, without any mention of the agreements. App.12-13. In short, the court did not use the "agreements to define [the] geographic market" (Br.47), so there is nothing to the claim that the decision allows future parties to "stymie a proposed geographic market" by entering similar agreements (Br.28).

Unable to keep its story straight, the Government tries using the agreements to *support* its alleged market, mere sentences before insisting that the agreements "have no proper place in a geographic market analysis." Br.44. That effort goes nowhere. The Government claims that the agreements "reveal[] that insurers do not view hospitals outside the Harrisburg area as 'realistic alternatives' to the defendants that would allow them to defeat a SSNIP." *Id.* This argument depends on the notion that the payors would not have signed these agreements unless they absolutely "need[ed]" to. *Id.* On the contrary, "any rational insurer" (*id.* 37) would gladly eliminate even a speculative possibility of rate increases—particularly when this comes at no cost to the payors because the Hospitals have "no intention of using this merger as an

opportunity to raise prices" (and thus have nothing to lose by signing the agreements). App.796; App.595:14-596:4, 620:20-621:18.  A merely theoretical possibility of a price increase does not prove the Government's case.  It certainly does not negate the undisputed *fact* that, for at least an overwhelming majority of patients and for at least five years, a price increase *cannot* occur.

***

For the many reasons set forth above, the district court correctly held that the Government failed to prove a relevant geographic market.  And because a valid market "is a necessary predicate to the finding of an antitrust violation," the court rightly held that the Government could not show a likelihood of success.  *Tenet*, 186 F.3d at 1051; *Freeman*, 69 F.3d at 268.  On this basis alone, the decision should be affirmed.

## II.    The District Court Did Not Clearly Err In Holding That The Combination's Many Procompetitive Effects Weigh In Favor Of Denying Injunctive Relief.

Even if the Government could show that the court clearly erred in rejecting its alleged market, that would not end the analysis.  Rather, the Government would need to show that the court *also* erred in determining that the equities support letting the combination proceed.  *Heinz*, 246 F.3d at 726.  It cannot make that showing, either.

The Government frames its equities argument as yet another attack on the integrity of the district court's opinion, deriding the court's analysis as "gratuitous" and "lack[ing] any analytical rigor."  Br.49.  According to the Government, the court was required to treat the issues discussed in this portion of its opinion either as a rebuttal of the presumption of illegality that the Government never established, or as "efficiency defense[s]."  Br.47-48; *see also* States' Am.23-24.  The Government is

wrong on both counts. Because the court had already concluded that the Government's "request for injunctive relief must be denied" (App.15), there was no presumption for the Hospitals to rebut and no need for them to establish any defense. And regardless of whether the court characterized them as "equities," "efficiencies," or something else, the bottom line remains unchanged: these considerations "demonstrat[e] that anticompetitive effects would not arise through the merger" and thus provided additional reasons to deny an injunction. App.15-16, 27-28.

### A.    *The Court Correctly Concluded That The Rate Agreements Support The Combination.*

As explained (*supra* I.B.3), the district court did not base its geographic-market analysis on the rate agreements. Instead, the court merely emphasized the "result of these agreements": "the Hospitals cannot walk away from these payors and [] rates *cannot increase* for at least 5 years." App.14. The court was right not to "blind [itself] to this reality." App.14. Courts do not hesitate to rely on agreements merging parties enter into. *See, e.g., United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 144 (E.D.N.Y. 1997) (emphasizing that merging parties "have stipulated with the New York State Attorney General not to raise prices for at least two years"); *F.T.C. v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1303, 1304-05 (W.D. Mich. 1996) (conditioning denial of injunction on consent decree "freez[ing] prices at current levels" for three years).

The Government's specific attacks on the rate agreements fail. Although not every payor has entered into one, the existing contracts cover 75-80% of the market and will, as a practical matter, keep the Hospitals from raising rates on other payors

(whose customers could simply switch to the covered payors).  App.792 ¶147.[13]

Moreover, it is of no consequence that the agreements do not specifically freeze rates

for risk-based contracts.  As the Government's expert on risk-based contracting

testified, reimbursement rates in risk-based contracts are typically "built on … a fee-

for-service chassis," and therefore the contracting payors are not concerned that risk-

based rates will escalate.  App.551:10-22; App.493 (90:16-91:15); App.760 (94:24-

95:10).  Finally, the agreements in no way free the Hospitals from needing to provide

quality care, since they do not negate the increasingly competitive environment in

which the Hospitals operate.  *Infra* II.C.[14]

The rate agreements show that this case does not fit the Government's narrative

of power-hungry entities seeking to make profits on the backs of consumers.  The

court did not clearly err in viewing the "reality" that rates "cannot increase" as

"extremely compelling" evidence in favor of letting the combination proceed.

App.13-14.

---

[13] As representatives of both Hospitals testified, they remain open to entering similar agreements with other payors, and offered to memorialize such agreements in a consent decree with the Commonwealth before this action was filed.  App.605:25-606:14, 622:15-623:4.

[14] In recognizing that patients respond to differences in quality of care, the Government only further undermines its claim that market analysis should focus exclusively on payors and not patients.  Any quality reductions by the combined Hospitals would give patients a reason to divert to other hospitals outside the alleged market.  The Government has no basis whatsoever for suggesting the Hospitals would cease seeking to provide their patients with the highest-quality care.

**B.**  **The Court Correctly Found That The Combination Will Generate Procompetitive Benefits By Enabling The Hospitals To Address Hershey's Capacity Constraints Immediately And Efficiently.**

The Government cannot dispute the district court's finding that "the merger would immediately make additional capacity available to Hershey, causing near instantaneous benefits to Hershey's patients." App.20.  Hershey's capacity constraints cause "overcrowding" with "negative consequences for patients at Hershey, who may not be comfortable placed in [] hallway beds … or 4- and 6-bedded rooms." App.18 n.5.  But because "Pinnacle has sufficient capacity available," it will be able to treat "lower-acuity patients" who otherwise would be treated at Hershey.  App.21.  As a result:  (1) Hershey's overcrowding will be alleviated; (2) the Hospitals will be able to "treat more patients at the locations best suited to their healthcare needs" (through "site-of-service adjustments"); (3) Hershey "will be able to admit more high-acuity patients," who "currently are being denied access within central Pennsylvania" and who "will benefit from Hershey's greater offering of complex treatments and procedures"; and (4) the combined Hospitals will "treat more people," which will "generate downward pricing pressure that greater efficiencies and a larger supply of services typically facilitates."  App.21-22 & n.6.

In the face of these overwhelming benefits, the Government can only mischaracterize the court's opinion.  The court did not "conclu[de] that the merger will add bed capacity" to "the supply now available in the Harrisburg area."  Br.50.  Instead, it correctly found that the site-of-service adjustments will "make additional capacity *available to Hershey*," allowing the Hospitals to use their total capacity more efficiently.  App.20-21 (emphasis added).

That is far from all.  The court also found that, "without the merger, Hershey intends to build a new bed tower, costing approximately $277 million," to address its capacity constraints.  App.19.  The tower's construction "would undoubtedly strain Hershey's financial resources, resulting in either increased charges for services or less investment in quality improvements."  App.20.  "Both outcomes would negatively impact patients at least until the bed tower could be completed, fully paid for, and operational."  App.20.  Thus, the ability to "forego this expenditure" by combining the Hospitals would further contribute to "downward pricing pressure."  App.22.

The Government cannot overcome these findings.  *First*, it was "quintessentially the province of the trial court" to evaluate the evidence and find "sufficiently reliable" the live, "sworn testimony" of Hershey's CEO and COO "that they will embark on [the bed tower] project absent the merger."  *Scully v. US WATS, Inc.*, 238 F.3d 497, 506 (3d Cir. 2001); App.21.  There was nothing "uncritical[]" about the court's approach.  Br.51.  *Second*, given its finding that the executives had made a "determination of this need" (to build a bed tower absent the combination), the court was right in concluding that it was "not within our purview to question" that "entirely reasonable" judgment by "second guess[ing] Hershey's business decision."  App.21.  *See, e.g.*, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 127 (3d Cir. 1999) ("The evidence reflects Heinz's strategic planning as to whether and when to pursue particular business opportunities.  We are unwilling to question such business judgment.").  And, *third*, because the court found that the savings would be extremely beneficial "[e]ven if the cost of the bed tower has been partially overstated," it did not need to find whether the cost actually had been overstated, nor was it obligated to determine the cost with precision.  App.20.

The Government also is wrong in arguing that forgoing the bed tower would be "a classic reduction in output that will lead to higher prices." Br.50. This argument conflates capacity and output. The relevant market here is for hospital *services*, not hospital *beds*. Br.1. Adding beds would increase *capacity* but would not itself increase *output;* output increases only if more services are provided. The Government assumes, and does not even try to prove, that constructing the tower would mean more *output* without the combination than with it. On the contrary, the site-of-service adjustments will result in the combined Hospitals immediately producing *more* output than they do today. App.21-22.[15]

Accordingly, the court was correct in "find[ing] that the efficiencies evidence overwhelmingly indicates that procompetitive advantages would be generated for the Hospitals' consumers." App.22-23.

### C.    *The Court Correctly Found That Repositioning By Other Area Health Systems Will Foster Robust Competition After The Hospitals Combine.*

The district court also correctly concluded that the rapid expansion of healthcare competition in central Pennsylvania further supports the combination. "Competition, in the form of nearby hospitals' growing ability to offer close substitutes for Hershey and Pinnacle['s] advanced care is escalating…. [T]his repositioning represents a direct and concerted effort to erode both hospitals' … patient base." App.23-24. As the

---

[15] The Government is wrong in arguing that capital savings are categorically non-cognizable. *See Butterworth*, 946 F. Supp. at 1300-01 (cognizable efficiencies included difference between capital expenditures with and without merger). The Government relies on *F.T.C. v. ProMedica Health Sys.*, No. 3:11-cv-47, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011), but the statements in that decision were based on the opinions of the Government's expert there. *Id.* at *36. The Government's expert *here* recognized that capital savings *are* cognizable efficiencies. App.765 (94:9-23); *accord* App.657:18-23.

court explained, this increasing competition has two beneficial implications for patients:  the hospitals moving into the region will be "a meaningful constraint on competition," while the combination will ensure that "Hershey and Pinnacle [] remain competitive in [this] climate where nearby hospitals are routinely partnering to assist each other in achieving growth and dominance."  App.25.  This analysis gave appropriate consideration to the "structure, history and probable future" of central Pennsylvania's healthcare market.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 322 n.38 (1962).

The Government again argues that the court "ignored" statements from payors. Br.55-56.  For reasons already discussed, however, that evidence does not support the Government's position.  *Supra* 21-24.  The Government conflates ignoring evidence with finding it, on balance, unpersuasive.  *Cf. Plant Genetic*, 315 F.3d at 1343.

The Government also wrongly claims that if the court's finding on geographic market is disregarded, no competing hospital outside the Harrisburg Area should be considered.  Br.55-56.  But the fact that, for instance, the University of Pennsylvania affiliated with Lancaster General "to take more … volume away from … Hershey" does not become irrelevant simply because the Government excluded Lancaster County from its alleged market.  App.24; App.681 ¶7; App.686.

More fundamentally, the Government contends that the district court "failed to ask the critical question whether [] 'repositioned' hospitals could replace Pinnacle or Hershey *in an insurer's network* for Harrisburg area residents."  Br.55-56.  This is another reprise of the Government's geographic-market arguments; it works no better

here.[16]  And even if this were the relevant question, it would not aid the Government, which made no showing that Pinnacle and Hershey "could replace" *each other* in an insurer's network.  As the court recognized, the Hospitals fundamentally differ: Hershey is an "academic medical center" that "offers a broad array of high-acuity services," including a "greater offering of complex treatments and procedures" than Pinnacle, which is a "community hospital[] focused on cost-effective acute care" but offering only "some higher-level services."  App.5-6, 21.  Pinnacle's Chief Medical Officer—who formerly practiced at Hershey—testified extensively regarding these differences, explaining that Pinnacle "focuses primarily on providing garden-variety, regular care," whereas Hershey "delivers care for a more complex group of patients and diseases, … spends a substantial amount of time educating and training physicians[,] and … provides research opportunities."  App.629:5-631:23; *see also* App.569:14-572:15; *supra* 3-5.  Even the Government's economic expert agreed that the Hospitals are "[m]ost certainly" differentiated.  App.560:20-21.[17]

Because the Hospitals are complementary, competition between them is limited.  App.664:22-665:20.  Payors and rival hospitals consistently recognized that the

---

[16] The Government also suggests—without support—that repositioning matters only if a single competitor could substitute for the combined Hospitals in a payor's network.  That is wrong.  *See HMG* § 9.3 (recognizing that anticompetitive effects can be counteracted by a single large firm or "one or more firms operating at a smaller scale").  In any case, the court rejected the Government's argument that the repositioning competitors are "too small to meaningfully compete with a combined Hershey and Pinnacle entity."  App.23-25 & n.10.

[17] In claiming that "[a]pproximately 98% of Hershey's patients could be treated at Pinnacle" (Br.4), the Government relies on an analysis of billing codes, not treatments actually performed.  App.563:24-564:25; *see also* App.663:3-21.  Billing codes themselves are not useful in assessing any overlap between the Hospitals, as reflected in the Hospitals' starkly different acuity-of-care measures.  App.562:11-564:25, App.775-79 ¶¶13-19.

Hospitals are fundamentally distinct and not close competitors. App.772 (237:5-14); App.760 (93:19-94:12), 761 (97:12-98:8); App.769 (206:21-210:2). Significantly, therefore, payors do not play the Hospitals against one another in bargaining. App.702-703 (124:19-125:12); App.756 (167:10-168:19); App.761 (97:24-98:19); App.763 (71:23-72:6).[18] This confirms that the Hospitals—whose average charges differ by more than $1,400 per patient *per day*—would not "replace" each other in payor networks. App.790 ¶91; Br.55.

Given these limits on current competition between the Hospitals, the district court was all the more correct in finding that "rival hospitals' competitive strength will result in a meaningful constraint on competition, benefitting Harrisburg area residents." App.25.

### D.    *The Court Correctly Found That The Combination Will Improve The Hospitals' Ability To Engage In Risk-Based Contracting.*

As the Government recognizes, the healthcare industry is transitioning from fee-for-service reimbursement models towards risk-based models, which encourage providers to reduce costs while increasing quality. Br.52. The federal government, for example, "intends to shift 50-80% of payments into risk based contracts by 2018." App.26. The court heard extensive testimony on this issue (App.25-26), including testimony that the combination would improve the Hospitals' ability to adapt to risk-based contracting. App.582:21-583:4, 604:10-605:24, 624:21-626:2. The court

---

[18] The Government purports to identify one such instance, when Payor A resisted a Pinnacle rate increase by threatening to create a network including only Hershey and Holy Spirit. Br.15. But Payor A's representative unequivocally testified that he was "attempting to play Pinnacle *and Holy Spirit* off against one another," and that he *has not* "attempted to play Hershey and Pinnacle against each other." App.702 (124:19-125:12) (emphasis added).

specifically found the testimony of Hershey's CEO on this topic "persuasive," and found that combining the Hospitals would yield "advantages" in "adaptation to risk-based contracting," which "will have a beneficial impact." App.26.

The Government again takes issue with the district court's weighing of the evidence, faulting it for supposedly relying "only on the self-interested testimony of Hershey's own chief executive." Br.53. But the court was not required to "verif[y]" credible testimony of a knowledgeable witness, and the Government points to no contrary evidence. Br.53.[19] Also, the court's finding of a "beneficial impact" from increased risk-based contracting (App.26) cannot be dismissed as "speculat[ion]" (Br.53) when the Government does not refute it, much less show that it was clearly erroneous.[20]

---

[19] In any case, the court specifically noted the "substantial amount of testimony" it had heard on this issue. App.25. And testimony at the hearing is far from the only evidence supporting the court's conclusion; payors similarly recognized that the combination would improve the Hospitals' ability to engage in risk-based contracting. App.704-706 (138:10-142:14); App.755-756 (165:15-166:20); App.758 (85:9-87:7); App.772 (237:24-239:12). The court was not required to tick through every piece of evidence it relied on. *Cf. Giles v. Kearney*, 571 F.3d 318, 329 (3d Cir. 2009) ("We give deference to the district court's account of the evidence if plausible in light of the entire record ….").

[20] The Government's arguments regarding the Affordable Care Act and "failing firms" hardly warrant mention. The district court did not "determine[] that the perceived needs of the healthcare system must take precedence over the antitrust laws." Br.57; *see also* States' Am.24-28. It instead made the well-founded observation that the Hospitals' combination would help them "adapt to an evolving landscape of healthcare that includes, among other changes, the institution of the Affordable Care Act." App.28. Similarly, the Hospitals did not make a "failing firms" argument (as the Government recognizes), and the court did not treat them "as embattled survivors hanging on for life." Br.58.

**E.    The Court Correctly Determined That Any Potential Harm Is Outweighed By The Public Benefits Of Allowing The Combination To Proceed.**

The Government again mischaracterizes the opinion below in claiming that "the court took no account of the strong 'public interest in effective enforcement of the antitrust laws.'" Br.59. In fact, the court's opinion ends with a section entitled "Public Interest in Effective Enforcement of Antitrust Laws." App.27. The court correctly recognized that while enforcement might be "made more difficult after the combination has been completed," divestiture "is by no means unheard of." App.27.

The Government failed to prove any circumstances that would make divestiture particularly difficult here. It instead relies on cases in which courts found—or themselves cited other cases in which courts had found—specific obstacles to post-consummation enforcement. *See, e.g.*, *Heinz*, 246 F.3d at 726 ("The district court found, and there is no dispute, that … it will be impossible as a practical matter to undo the transaction."). Again, however, fact-findings in different cases are no substitute for evidence. *See id.* (rejecting assertion as not "supported by record evidence" where it was based "not on the facts of this case but on our statement in" another case).

The Government also now invokes—though it did not raise in the district court—its recent experiences with mergers in Georgia and Idaho. But the FTC has explained that "Georgia's certificate of need ('CON') laws and regulations … render[ed] a divestiture … virtually impossible." Statement of the FTC In the Matter of Phoebe Putney Health System, Inc., et al., (Mar. 31, 2015), https://goo.gl/oLxUg6. The Government has not suggested any similar problem here. And in Idaho, the court issued a detailed, stipulated order designed to maintain assets and accomplish a

divestiture, with assistance from a court-appointed trustee, within one year. *St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, No. 1:12-cv-00560, 2015 WL 9957541 (D. Idaho Dec. 10, 2015). The Government has offered no reason to believe divestiture will not succeed in that case or—much more to the point—would not succeed here, in the unlikely event that it would be needed.[21]

Moreover, any possible need to spend resources on divestiture is strongly outweighed by the fact that "an injunction would deny consumers the procompetitive advantages of the merger." App.22. The district court concluded, "[a]fter a thorough consideration of the equities in play," that the public interest supported allowing the combination to proceed. App.28. The Government's only response is that the equities supporting the injunction do not qualify as "public" because they "will be available after a trial on the merits." Br.61. To the contrary, as the Hospitals unequivocally stated below, they "would have to abandon the combination rather than continuing to expend substantial resources litigating" if an injunction is issued. Hosps.' Pre-Hrg. Br. 2 (Mar. 28, 2016).[22] An injunction would thus preclude the many public benefits recognized by the court: patients would continue suffering the effects of Hershey's capacity constraints; Hershey would spend hundreds of millions of dollars on a bed tower that the combined Hospitals would not need; payors and patients would not receive price decreases and quality improvements via the site-of-

---

[21] In addition, the Government's passing allegation of "immediate competitive harm" is unsupported, and it is refuted by the rate agreements discussed above.

[22] As the court noted, the Hospitals do not argue for an injunction based on "private" equities. App.27-28. It would be "at best a 'private equity'" if an injunction did not "kill the merger" but merely led to a change in the acquisition price. *Heinz*, 246 F.3d at 726-27. Here, by contrast, there is no dispute that an injunction would cause the Hospitals to abandon the transaction, eliminating the combination's *public* benefits.

service adjustments; the beneficial impact of better adaptation to risk-based contracting would be lost; and the Hospitals would be less able to continue attracting top medical students and residents, in the face of intensifying regional competition.

The district court heard five days of evidence, assessed the credibility of fifteen witnesses, weighed the copious documentary evidence, and ultimately determined that the public interest is best served by letting the combination proceed. The Government has put forth no valid basis for setting aside that finding.

## CONCLUSION

The denial of preliminary injunctive relief should be affirmed.

Dated:  June 13, 2016                    Respectfully submitted,

                                         /s/ Louis K. Fisher
                                         _____

                                         Toby G. Singer
                                         Adrian Wager-Zito
                                         Julie E. McEvoy
                                         Louis K. Fisher
                                         Christopher N. Thatch
                                         William D. Coglianese
                                         Alisha M. Crovetto
                                         Jon G. Heintz
                                         JONES DAY
                                         51 Louisiana Avenue, N.W.
                                         Washington, D.C. 20001-2113
                                         (202) 879-3939

                                         James P. DeAngelo
                                         Kimberly A. Selemba
                                         MCNEES WALLACE & NURICK LLC
                                         100 Pine Street
                                         Harrisburg, PA 17101
                                         (717) 237-5470

                                         *Counsel for Appellees Penn State Hershey Medical
                                         Center and PinnacleHealth System*

## CERTIFICATE OF COMPLIANCE

I certify that Appellees' Brief complies with the type-volume limitation contained in Rule 32(a)(7)(B), as it contains 13,745 words, exclusive of the portions exempted by Rule 32(a)(7)(B)(iii), as determined by the Microsoft Office Word 2007 program used to prepare this brief.  Appellees' Brief also complies with the typeface and type-style requirement of Rule 32(a)(5) and (6), as it was prepared using 14-point Garamond, a proportionally spaced font.

I further certify that the text of the electronically filed version of Appellees' Brief is identical to the text in the paper copies of the brief.

In addition, I certify that the electronic version of Appellees' Brief has been scanned for viruses using McAfee VirusScan Enterprise, Version 8.8 (last updated June 13, 2016).  No virus was detected.

Finally, I certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.


Dated:  June 13, 2016                    */s/* Louis K. Fisher
                                        _____

                                        *Counsel for Appellees Penn State Hershey Medical*
                                        *Center and PinnacleHealth System*

## CERTIFICATE OF SERVICE

I certify that on June 13, 2016, the foregoing was electronically filed with the United States Court of Appeals for the Third Circuit using the CM/ECF system. All parties have consented to receive electronic service and will be served by the ECF system.

Dated:  June 13, 2016          /s/ Louis K. Fisher
_____

*Counsel for Appellees Penn State Hershey Medical Center and PinnacleHealth System*